**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-1821**

---

MARK ZAID,

        Plaintiff – Appellant,

v.

DEPARTMENT OF JUSTICE,

        Defendant – Appellee.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge. (8:21−cv−01130−DKC)

---

Argued: January 25, 2024             Decided: March 25, 2024

---

Before WILKINSON, GREGORY, and HEYTENS, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Gregory and Judge Heytens joined.

---

**ARGUED:** Bradley Prescott Moss, MARK S. ZAID, P.C., Washington, D.C., for Appellant. Tarra Deshields-Minnis, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Erek L. Barron, United States Attorney, Alan C. Lazerow, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

WILKINSON, Circuit Judge:

The Freedom of Information Act grants members of the public broad access to federal agency records upon request. 5 U.S.C. § 552(a). But that access is not unlimited. An agency may withhold records if it can establish that they fall within one of the Act's exemptions. This case primarily involves exemption 7(A), which permits an agency to withhold certain law enforcement records whose release "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The FBI invoked this exemption to withhold records requested by appellant Mark Zaid related to the criminal investigation into one of his clients. Zaid sued the FBI to release the requested records, but the district court found that the records were exempt from disclosure. For the reasons that follow, we affirm the district court's judgment.

I.

A.

In March 2020, the United States charged Zackary Sanders with production and possession of child pornography in the U.S. District Court for the Eastern District of Virginia. *See United States v. Sanders*, No. 1:20-cr-143-TSE (E.D. Va. 2020). The prosecution arose after an undisclosed foreign law enforcement agency informed the Federal Bureau of Investigation (FBI) that an IP address registered to Sanders's residence had been used to access violent child pornography on the web.

B.

In April 2021, attorney Mark Zaid submitted a Freedom of Information Act (FOIA) request to the FBI for fourteen types of records related to the Sanders investigation. Request

2

numbers (1)–(10) and (13) are at issue in this appeal and involved the following information: (1) information received by the FBI from a foreign law enforcement agency on or about August 19, 2019; (2) copies of the warrants received from said law enforcement agency; (3) an administrative subpoena relating to the target IP address; (4) the report drafted by the FBI Special Agent assigned to the case to open an investigation into the target IP address; (5) the February 2020 search warrant stating that a user of the target IP address accessed child pornography; (6) any records outlining information relied upon in forming the basis for the February 10 warrant; (7) any communication between the U.S. government and the foreign law enforcement agency regarding the target IP address or website used to access the pornography; (8) any records outlining the government's deanonymizing the IP addresses used to access the pornography; (9) any FBI affidavits, sworn declarations, court filings or internal records that contain any of nine search terms; (10) affidavits or sworn declarations filed in federal district court by the Special Agent assigned to the case since May 2016; and (13) any records identifying the foreign law enforcement agency that tipped the FBI off to Sanders's malfeasance. *See* J.A. 95–97.

The FBI ran the requested searches and advised Zaid that the records he requested were located in an investigative file exempt from disclosure under FOIA exemption 7(A) because they were "compiled for law enforcement purposes" and their release "could reasonably be expected to interfere with enforcement proceedings." J.A. 21; *see* 5 U.S.C. § 552(b)(7)(A). Zaid challenged the FBI's withholding of the above records in the U.S. District Court for the District of Maryland. *See Zaid v. DOJ*, 2023 WL 4351401, at \*1 & n.2 (D. Md. July 5, 2023).

As the FOIA dispute evolved in Maryland, the criminal case against Sanders advanced in Virginia, culminating in Sanders's conviction of several counts of production, receipt, and possession of child pornography in October 2021. *See United States v. Sanders*, No. 1:20-cr-143-TSE (E.D. Va. 2020).

After Sanders's conviction, the FBI renewed its search for records responsive to Zaid's FOIA request. Between October 2021 and September 2022, the FBI sent Zaid several letters informing him of its progress and releasing certain nonexempt documents. The FBI maintained, however, that records in Sanders's investigative file were categorically exempt under 7(A).

C.

Upon completing its search for responsive records, the government moved for summary judgment on Zaid's FOIA challenge. The government principally argued that the records it withheld were categorically exempt from disclosure under exemption 7(A). It argued that the records were also exempt under other FOIA exemptions, in the alternative.

In support of its motion, the government attached a declaration from Michael Seidel, Chief of the Record/Information Dissemination Section within the FBI's Information Management Division. Seidel attested that after Sanders's conviction, the FBI reached out to the Special Agent assigned to the case "to determine whether the release of information within the responsive file would still cause harm to any pending enforcement proceeding." J.A. 40. According to the declaration, the Special Agent stated that release of the responsive records would still reasonably be expected to interfere with ongoing proceedings in Sanders's own criminal case, including his pending appeal and future collateral challenges.

4

The Seidel declaration did not stop there. It noted that in addition to proceedings against Sanders himself, the Special Agent "advised that the responsive records are part of ongoing investigations of third-party individuals" and that "release of the information could interfere with those pending investigations even after Sanders's appeals . . . are exhausted." J.A. 40–41, 45. The declaration explained that "release of these records would allow these third-party individuals to critically analyze documents concerning these investigations," giving them "the unique advantage of prematurely knowing the details surrounding the investigation of their criminal activities, including the identity of victims and direct and circumstantial evidence gathered during the investigation." J.A. 45. This, the declaration explained, posed the risk that the targets "could use the released information to their advantage to alter or destroy evidence, create false evidence, harass or otherwise intimidate victims and . . . witnesses, or evade the FBI's investigative efforts." J.A. 45.

After establishing that the records continued to pose a threat to enforcement proceedings, the Seidel declaration stated that providing a document-by-document description of the responsive records within Sanders's investigative file would undermine the very interests that the FBI sought to protect in withholding them. Instead, the declaration broke the records down into nineteen "types of records"—including "Electronic Communications," "Non-Public Court Documents," and "Memoranda and Correspondence"—and provided detailed descriptions for each. *See* J.A. 42–44.

The declaration then "grouped the responsive records into functional categories" to demonstrate how the information contained therein could reasonably be expected to interfere with enforcement proceedings. J.A. 45–46. The declaration set forth two

5

functional categories of records, and then broke those categories down further into functional subcategories. It explained that "[e]ach responsive record withheld falls into either one or both of the functional categories." J.A. 46. The first category, "Administrative Material," is not at issue in this appeal. J.A. 46–47.

The second category, "Evidentiary and Investigative Material," "includes evidence, analyses of evidence, and derivative communications discussing or incorporating evidence." J.A. 47. The two subcategories of "Evidentiary and Investigative Material," are (1) "Information Concerning Physical and Documentary Evidence" and (2) "Records Containing the Exchange of Information between Law Enforcement Agencies." J.A. 47–48.

The declaration provided detailed descriptions of each functional subcategory and "the anticipated harm that could reasonably result from the release of this material." J.A. 46–48. Beginning with Information Concerning Physical and Documentary Evidence, the declaration described the subcategory as follows:

> Information concerning physical and documentary evidence may include information or summaries of information obtained from searches and seizures, surveillance, victim interviews, subpoenas, laboratory reports, and other law enforcement activities. To more fully describe this information could reasonably lead to disclosure of non-public aspects of pending investigative efforts.

J.A. 47–48.

The Seidel declaration then explained how release of the information within that subcategory "could be detrimental to the success of pending and prospective enforcement proceedings" by (1) "permitting subjects to estimate the scope of the FBI's investigation

6

and judge whether their activities are likely to be detected"; (2) "allowing investigative subjects to discern the FBI's investigative strategies and employ countermeasures to avoid detection and disruption by law enforcement"; and (3) "allow[ing] investigative targets to formulate strategies to contradict evidence to be presented in court proceedings." J.A. 48.

The declaration described the second subcategory, Records Containing the Exchange of Information between Law Enforcement Agencies, as containing "records documenting and detailing the exchange of information among the FBI and its law enforcement partners . . . to help identify subjects and individuals of investigative interest and to assist in locating witnesses and victims." J.A. 48. It cautioned that this cooperative effort was based on "the mutual understanding that information provided to the FBI by these agencies [would] not be prematurely released." J.A. 48.

The declaration then linked the disclosure of such information to the potential repercussions of its release. It stated that release of the records in this subcategory "would identify the FBI's investigative interest in particular individuals and subject third parties, such as witnesses and victims, to potential harassment or other forms of intimidation, and physical and mental harm." J.A. 48.

After completing its discussion of exemption 7(A), the declaration set forth the government's alternative argument that the withheld records were also exempt from disclosure under the other FOIA exemptions.

### D.

Zaid challenged the government's motion for summary judgment on the basis that the government had not met its evidentiary burden to establish that all of the records

7

withheld were exempt under exemption 7(A) or the alternative exemptions. He cited a recent Middle District of Florida decision in related litigation rejecting the government's invocation of the same exemptions. *See Smith v. DOJ* ("*Smith I*"), 2022 WL 4110291 (M.D. Fla. Sept. 8, 2022). That case involved an identical FOIA request submitted by Zaid's law firm challenging the three types of information not at issue in this appeal: (11) records relating in any way to Zackary Sanders from May 2019 to February 2020; (12) records pertaining to Sanders's IP address from May 2019 to February 2020; and (14) records referencing the terms "Hurtcore" and "FLA." *Id.* at *1.

Relying on the Middle District of Florida's reasoning, Zaid argued that the FBI's declarations invoking the exemptions did not provide the necessary level of specificity with respect to the two functional subcategories of Evidentiary and Investigative Material discussed above: (1) Information Concerning Physical and Documentary Evidence and (2) Records Containing the Exchange of Information Between Law Enforcement Agencies.

E.

The government submitted two additional declarations in reply to Zaid's opposition to its motion for summary judgment: a second declaration from Seidel and one from an FBI Special Agent assigned to investigate child pornography cases. *See* J.A. 245–58, 260–263. Zaid did not object to these additional declarations.

The FBI Special Agent largely expounded upon the information contained in the first Seidel declaration. But the second Seidel declaration elaborated on the repercussions of requiring the FBI to disclose records in the Records Containing the Exchange of

8

Information between Law Enforcement Agencies subcategory. It stated that the "cooperative exchange of information between the FBI and other law enforcement agencies is based on the mutual understanding"—and sometimes, written agreement—that "information provided to the FBI by these agencies will not be prematurely released and the identity of the law enforcement agencies providing such information will not be disclosed." J.A. 250. It cautioned that, if the FBI does not follow through on its end of the bargain, its partners may be "hesitant to share information, which would, in turn, diminish the scope or volume of reliable intelligence or investigative information available to the FBI, causing harm to FBI investigations." J.A. 251.

F.

Before the district court ruled on the motion, Zaid filed a notice of supplemental information alerting the district court to a second opinion from the Middle District of Florida rejecting the government's renewed motion for summary judgment. *See Smith v. DOJ* ("*Smith II*"), 2023 WL 4350537 (M.D. Fla. May 10, 2023). In that case, the government had included additional declarations to support its renewed motion, but the Middle District of Florida found that the declarations were still insufficient to invoke the claimed exemptions. *Id.* at *3. Zaid argued that the district court in the present case should find the same.

G.

The district court granted the government's motion for summary judgment. *See Zaid*, 2023 WL 4351401, at *11–12, 18. The court held that, "contrary to [Zaid's] unsupported lamentations," the government's submissions were sufficient to show that it

9

had "properly invoked the categorical exemption of 7(A)." *Id.* at *12. It found that, in the alternative, the other exemptions were sufficient to warrant summary judgment on Zaid's FOIA challenge as well. *Id.* at *13–17.

Zaid filed a timely appeal.

## II.

"The question of whether a district court properly granted the government summary judgment in a FOIA action is one of law which we review de novo." *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 290 (4th Cir. 2004). Because the government bears the burden of proving requested materials are exempt from disclosure, we must ensure the government provided the district court with "an adequate factual basis for the decision rendered." *Rein v. U.S. Pat. & Trademark Off.*, 553 F.3d 353, 358 (4th Cir. 2009); *Spannaus v. DOJ*, 813 F.2d 1285, 1288 n.4 (4th Cir. 1987). This is no different than in any other case where a party moves for summary judgment on an issue for which it will bear the burden of persuasion at trial. *See*, *e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) (discussing entitlement to summary judgment where movant bears the "burden of persuasion").

## III.

## A.

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Thus FOIA provides that "when 'any person' makes a sufficiently specific and reasonable request for records from a government agency, the agency 'shall make the

10

records promptly available.'" *Am. Mgmt. Servs., LLC v. Dep't of the Army*, 703 F.3d 724, 728 (4th Cir. 2013) (quoting 5 U.S.C. § 552(a)(3)(A)). As the government grows in size and complexity, the need for agency transparency becomes more apparent.

But Congress recognized that "public disclosure is not always in the public interest," *Baldrige v. Shapiro*, 455 U.S. 345, 352 (1982). The FOIA statute therefore contains nine exemptions that "reflect a wide array of concerns," *Hunton & Williams v. DOJ*, 590 F.3d 272, 277 (4th Cir. 2010), and "are designed to safeguard various public interests against the harms that would arise from overbroad disclosure," *Hanson*, 372 F.3d at 290.

This appeal primarily concerns exemption 7(A), which permits the withholding of "records or information compiled for law enforcement purposes" whose disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Zaid challenges the district court's determination that the FBI was entitled to withhold documents based on exemption 7(A) or other exemptions in the alternative. Because we find that exemption 7(A) protects the disputed records from disclosure, we need not reach the other exemptions.

### B.

Investigations by their very nature may require a measure of nondisclosure as law enforcement gathers evidence before an arrest may lawfully be made and a prosecution fairly brought. Congress enacted exemption 7(A) because it "recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it came time to present their case." *Robbins Tire*, 437 U.S. at 224. "Foremost among the purposes of

11

this Exemption was to prevent 'harm [to] the Government's case in court,' by not allowing litigants 'earlier or greater access' to agency investigatory files than they would otherwise have." *Id.* at 224–25 (citation omitted).

Although we generally construe FOIA exemptions narrowly, *J.P. Stevens & Co. v. Perry*, 710 F.2d 136, 139 (4th Cir. 1983), the text of § 552(b)(7)(A) is broadly worded. Indeed, Congress amended the statute in 1986 to expand the scope of exempt law enforcement records from those which "would" interfere with enforcement proceedings to those which "could reasonably be expected" to do so. *See* Pub. L. 99–570, 100 Stat 3207 (October 27, 1986). Thus, the government's showing "is to be measured by a standard of reasonableness, which takes into account the lack of certainty in attempting to predict harm while providing an objective test." *Spannaus*, 813 F.2d at 1288 (internal quotation marks omitted).

The agency bears the burden to establish that exemption 7(A) applies. 5 U.S.C. § 552(a)(4)(B). But it need not establish that 7(A) applies to each record withheld. The Supreme Court has held that the exemption may be invoked on a categorical or "generic" basis by grouping records into categories and explaining how each category would generally interfere with enforcement proceedings. *See Robbins Tire*, 437 U.S. at 223–24.

In *Spannaus*, we held that the government "fully met its burden" to invoke exemption 7(A) when it "categorized the kinds of documents at issue and . . . specifically identified the type of information they contain and the harms their release could have in pending proceedings." 813 F.2d at 1289. There the FBI stated that a *Vaughn* index of the responsive records would "jeopardize enforcement proceedings and defeat the purpose of

12

the exemption." *Id.* at 1287. So it submitted a declaration in support of its motion for summary judgment that described categories of the records at a general level and explained how their disclosure would interfere with enforcement proceedings. *Id.*

The declaration stated that the requested records included details about the decision to open and to pursue the investigation; witness interviews; prosecutors' opinions; and "other sundry items of information." *Id.* It then identified three ways in which such information's release could interfere with enforcement proceedings: "(1) destruction or alteration of evidence yet to be discovered; (2) identification of individuals who possess information relative to the investigation, leading to possible intimidation and/or harm; and, (3) use of the information released to establish fraudulent alibis." *Id.* On this record, we found that the government had "fairly describe[d] the content of the material withheld and adequately state[d] its grounds for nondisclosure," and affirmed summary judgment in its favor. *Id.* at 1289 (quoting *Barney v. IRS*, 618 F.2d 1268, 1272 (8th Cir. 1980)).

The government's evidence in the present case falls safely within the scope of protection established in *Spannaus*. In both cases, the government conducted a document-by-document review of the records, grouped them into functional categories, and demonstrated how release of information contained within those functional categories could reasonably be expected to interfere with enforcement proceedings. Here the government submitted almost one hundred pages of declarations that "explained in detail why [exemption 7(A)] applied to the information and documents withheld." *See Bowers v. DOJ*, 930 F.2d 350, 353 (4th Cir. 1991). "This is substantially more than is required" and

13

provided the district court with an adequate basis for finding the government had met its burden. *Id.* at 357 (discussing *Spannaus*, 813 F.2d at 1288).

C.

Zaid does not dispute that it was the government's prerogative to invoke exemption 7(A) on a categorical basis. Instead, he argues that the government failed to sufficiently describe the two functional subcategories at issue. His arguments are without merit.

Regarding the Information Concerning Physical and Documentary Evidence subcategory, Zaid contends that the FBI failed to describe the records in a functional manner because the declaration only described what the subcategory "may" include. But, as in *Spannaus*, the government here asserted that providing a more detailed description "could reasonably lead to disclosure of non-public aspects of pending investigative efforts." *Compare* J.A. 48 *with Spannaus*, 813 F.2d at 1287. Zaid has not endeavored to dispute this risk, nor has he questioned the government's good faith in making the assertion. *See Am. Mgmt. Servs., LLC*, 703 F.3d at 733 ("Because we have 'no reason to question the good faith of the [agency],' we are 'entitled to accept the credibility of the affidavits.'").

Moreover, the link between releasing information "obtained from searches and seizures, surveillance, victim interviews, subpoenas, laboratory reports, and other law enforcement activities" and the risk to other "pending and prospective" child pornography proceedings is clear. J.A. 47–48. Such information would naturally and necessarily allow other defendants in Sanders's criminal circle to "discern the FBI's investigative strategies and employ countermeasures to avoid detection and disruption by law enforcement; and

14

allow investigative targets to formulate strategies to contradict evidence to be presented in court proceedings." J.A. 48. We find that the government's prediction of harm was "reasonable[]" and warranted exemption 7(A) protection. *See Spannaus*, 813 F.2d at 1288.

Zaid also claims that the FBI failed to define the Exchange of Information Between Various Law Enforcement Agencies subcategory functionally because it only linked the records to past investigative efforts. *See Robbins Tire*, 437 U.S. at 230 ("[T]he Exemption d[oes] not endlessly protect material simply because it was in an investigatory file.").

Not so. The Seidel declaration rationally linked the disclosure of records documenting the exchange of information between the FBI and its law enforcement partners to an interference with prospective enforcement proceedings. Namely, that "release of this information would identify the FBI's investigative interest in particular individuals and subject third parties, such as witnesses and victims, to potential harassment or other forms of intimidation, and physical and mental harm." J.A. 48. We have held that these kinds of harm "warrant an exemption under subsection (b)(7)(A)." *Spannaus*, 813 F.2d at 1289.

Zaid contends that these risks were insufficiently concrete because the government failed to point to any specific prospective law enforcement proceeding, instead relying on "abstract prospective possibilities." Appellant's Reply Br. at 4. But this ignores the covert, online nature of child pornography offenses.

The name of the game in child pornography prosecutions is compiling evidence of a target's receipt or possession of child pornography. *See, e.g., United States v. Miltier*, 882 F.3d 81, 86–87 (4th Cir. 2018). Such materials are generally accessed online and

15

downloaded to a personal computer. *Id.* at 85–86. A prospective target that knows he is being monitored by the FBI could try to alter or conceal evidence of past use and could inform other users of the websites he frequented to do the same. In other words, the government cannot point to a prospective target without undermining its case against him and potentially others in his criminal network.

Moreover, the government noted the general risk to future enforcement proceedings if the FBI were forced to disclose its communications with other law enforcement agencies. *See* J.A. 48. We have recognized that disclosure of records that would "reveal information provided to the FBI by a foreign government" and "identify the governmental entity in question . . . would have a chilling effect on the free flow of information between the United States intelligence and law enforcement agencies and their foreign counterparts." *Bowers*, 930 F.2d 357–58. The second Seidel declaration represented that this would, "in turn, diminish the scope or volume of reliable intelligence or investigative information available to the FBI, causing harm to FBI investigations." J.A. 251. We cannot ignore the commonsense conclusion that requiring disclosure of these documents would make other law enforcement agencies, foreign or domestic, think twice before assisting the FBI.

Zaid primarily relied on two Middle District of Florida decisions to argue that the government had not met its burden. *Smith I*, 2022 WL 4110291; *Smith II*, 2023 WL 4350537. Although those cases involved different parts of the FOIA request, the issues presented there were essentially the same as those presented in this case. But Zaid acknowledges that those cases were not binding on the district court here. Appellant's Opening Br. at 26 (citing *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)). And they are

16

certainly not binding on this court. *See Cooper v. Harris*, 581 U.S. 285, 298–99 (2017) ("Whatever findings are under review receive the benefit of deference, without regard to whether a court in a separate suit has seen the matter differently."). Our review of the record convinces us that the district court had a more-than-adequate basis for finding exemption 7(A) applied.

## IV.

Far from invoking a "blanket exemption" for all records in Sanders's investigative file, *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 789 F.2d 64, 65 (D.C. Cir. 1986), the government here broke down the kinds of records withheld under exemption 7(A) into nineteen well-defined categories, it conducted a document-by-document review of the records, it grouped them into functional categories, and it demonstrated how release of information contained within those functional categories could reasonably be expected to interfere with enforcement proceedings, not only against Sanders, but other prospective child pornography targets as well.

If the government's declarations here do not establish its entitlement to exemption 7(A), it is hard to imagine declarations that could meet this burden without requiring the government to reveal the very information it sought to protect. Indeed, to hold against the government in this case would set the burden so high as to risk writing the exemption out of the statute.

The purpose of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976), not to give criminal suspects "earlier or greater access to agency investigatory

17

files than they would otherwise have," *Robbins Tire*, 437 U.S. at 224 (internal quotation marks omitted). The Federal Rules of Criminal Procedure for example make clear what government records are available to defendants and when. *See* Fed. R. Crim. P. 16. Congress enacted exemption 7(A) in part to prevent litigants from using FOIA to supplement or override the Federal Rules. *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153 (1989) ("In deciding whether Exemption 7 applies, moreover, a court must be mindful of this Court's observations that the FOIA was not intended to supplement or displace rules of discovery."). We serve that purpose by upholding the district court's grant of summary judgment on Zaid's FOIA challenge.

The judgment of the district court is hereby affirmed.

*AFFIRMED*